**HOOVER TRANSPORTATION SERVICES, INC., Plaintiff–Appellee,**

v.

**Tim A. FRYE, Sr. dba FSI, Inc., Defendant–Appellant.**

No. 02–3940.

United States Court of Appeals, Sixth Circuit.

Sept. 12, 2003.

Craig A. Smith, Gamble, Hartshorn, Grace, Alden & Close, Columbus, OH, for Plaintiff–Appellee.

Todd A. Brenner, Audrey Varwig, Brenner, Brown, Golian & McCaffrey, Columbus, OH, for Defendant–Appellant.

Before: GUY, BOGGS, and DAUGHTREY, Circuit Judges.

PER CURIAM.

Tim A. Frye appeals the preliminary injunction issued in favor of Hoover Transportation Services, Inc., by the district court, enjoining him from operating his trucking business in Charlotte, North Carolina for one year. A motion to stay the injunction pending appeal was denied by the district court on December 4, 2002.

We affirm.

## I

Hoover, based in Ohio, coordinates the interstate transportation of freight, using owner-operator truck drivers under lease with Hoover. Frye is the owner of FSI and a former employee and agent of Hoover. Prior to working for Hoover, Frye had operated a trucking business and had added a container/intermodal business to his operations in 1989.

Hoover hired Frye in 1995 to manage its Charlotte, North Carolina, facility, Frye asserts that Ken Hoover, the owner of Hoover, asked him to sign a non-compete agreement at that time but that he refused. While employed at Hoover, and with Hoover's knowledge. Frye continued his container business. In November 1999, Mr. Hoover visited the Charlotte facility and asked Frye to focus on Hoover's business rather than his own. Frye asserts he resigned after Mr. Hoover told him to double the income from the Charlotte facility using the same level of staff. Mr. Hoover then offered to sell the facility to Frye.

Instead, in January 2000, they entered into an agency contract that allowed Frye to work as an agent for Hoover under the FSI name. In order to run the Charlotte operation. FSI bought Hoover's Charlotte property, equipment, and leasehold interest for $50,000. The contract stated that Frye would act as Hoover's freight solicitor and dispatching representative in the Charlotte area. He was to maintain and operate the freight terminal, solicit freight for transportation by Hoover, and recruit drivers. The period of the contract was unspecified.

In August 2001, Frye told Mr. Hoover that he was going to turn the Charlotte operation back over to Hoover pursuant to Paragraph 10 of the agency contract ("If at any time Agent chooses to cease operations, Carrier will be offered the opportunity to assume the operation for the fair market value of all equipment necessary to continue the contract authority operation."). Frye told Mr. Hoover that he would continue to operate the container yard and conduct other business such as buying and selling containers. Frye testified at the preliminary injunction hearing that he had planned to terminate his agency relationship with Hoover and that shortly thereafter begin an exclusive agency relationship with Five Star Transport, Inc., a competitor of Hoover's, based in South Carolina. In October 2001, Frye

talked to Mr. Hoover about selling FSI's business to Hoover, but, according to Frye. Mr. Hoover told him that he wanted Frye to continue as Hoover's agent.

Frye claims that all of the customers he dealt with during his agency relationship with Hoover were FSI's. He asserts that Hoover was merely responsible for paying liability insurance on the trucks, collecting money from FSI's customers for the freight business, and paying the agreed fees to FSI. Frye also claims that problems arose with the contract because of Hoover's actions. For instance, he claims that Hoover failed to pay commissions that were due to FSI under the contract. He also alleges that Hoover made demands of FSI that were not contemplated in the contract, nor made of any of Hoover's other agents. Frye claims that Hoover was unable to keep up with the expanding business and that it would not cooperate with FSI and its employees. He also claims that Hoover did not comply with Department of Transportation requirements to provide safety and hazardous materials training for owner-operators, although it was its responsibility to do so.

Frye contends that because of his deteriorating relationship with Hoover, he began to negotiate with Five Star, and accepted a proposal to serve as its agent in October 2001. He claims that he solicited as new drivers only those who had not previously transported freight for Hoover. Frye promoted an employee of FSI, Frank Clotz, and had him handle all of FSI's Five Star business.

Frye operated the Five Star terminal from the same address as that of the Hoover terminal. With only one exception, Frye did not notify any of the shippers that he was an agent with Five Star until December 19, 2001. On December 11, 2001, Frye and Mr. Hoover had a conversation in which Frye told Mr. Hoover he was going to terminate the agency con-

tract. On December 11, 2001, Frye sent out a letter to all of the Hoover drivers, notifying them that they would be given the opportunity to change their leases to Five Star. In response, 16 drivers signed leases with Five Star. On December 18, 2001, Frye notified Hoover that he was terminating the contract with the required thirty-days notice. The next day, Hoover notified Frye that due to Frye's breach of the agency contract, Hoover was terminating the relationship immediately.

Hoover then hired Frank Clontz to manage a new location for its Charlotte operation. Frye claims that Clontz provided Hoover with Frye's trade secrets and other confidential information. The evidence presented at the preliminary injunction hearing showed that Frye continued to use the Hoover name in conjunction with his Five Star operations, and continued to use the name Hoover as his listing with directory assistance. Frye claims to have provided Hoover with the files of all of the drivers who had contracted to drive for Hoover. He also returned the computer system and software that FSI had purchased to operate the business. He claims Hoover never asked him to change his fax or phone number or refrain from hiring Hoover employees. He asserts he offered to sell Hoover the operation, pursuant to paragraph 10 of the agency contract, but that Hoover demanded he relinquish the business for no consideration.

Hoover claims that while still acting as an agent for Hoover, Frye diverted at least 81 loads of freight from Hoover to Five Star and encouraged and assisted 16 drivers who were under lease to Hoover to terminate their leases and sign with Five Star. Hoover claims that it maintains confidential and proprietary information, such as files containing names and addresses of shippers or customers of Hoover, corporate financial information, and price infor-

mation. Hoover contends that these are trade secrets and claims to have taken steps to keep this information from becoming public. Hoover asserts that Frye had access to all of this information while acting as its agent. Hoover claims that Frye continues to use its trade secrets for the benefit of himself and Five Star. Frye denies that FSI possessed any of this information.

Hoover filed an action against Frye, and later added Five Star, in Ohio state court, for equitable relief and damages. Frye removed the case to federal district court. The amended complaint alleges misappropriation of trade secrets, breach of contract, unfair competition, breach of fiduciary duty, interference with contractual relations, deceptive trade practices, and fraud. Hoover sought preliminary and permanent injunctions enjoining Frye from misappropriating trade secrets and engaging in a competing business, an accounting of all wrongfully obtained remuneration, nine million dollars in compensatory damages, two million dollars in punitive damages, remuneration of commissions, a constructive trust for diverted revenues, and attorney fees.

Frye filed counterclaims against Hoover, alleging misappropriation of trade secrets, breach of contract, unfair competition, breach of fiduciary duty, interference with operations and business relations, deceptive trade practices, fraud, and defamation. Frye sought a permanent injunction, an accounting of all wrongfully obtained remuneration, a constructive trust for diverted revenues, five million dollars in compensatory damages, ten million dollars in punitive damages, and attorney fees.

After a two-day hearing, the district court granted Hoover's motion for a preliminary injunction. Pursuant to that order, Frye is enjoined from operating his trucking business in Charlotte, North Carolina, for one year. Frye filed a timely appeal. A motion to stay the injunction pending appeal was denied by the district court.

## II

We review a district court's decision to grant a preliminary injunction for an abuse of discretion. *Memphis Planned Parenthood, Inc. v. Sundquist,* 175 F.3d 456, 460 (6th Cir.1999). There has been an abuse of discretion "if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Blue Cross and Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.,* 110 F.3d 318, 322 (6th Cir.1997).

Before issuing a preliminary injunction, a court must inquire into (1) whether the movant has a shown a strong likelihood of success on the merits; (2) whether the movant has shown that irreparable harm would result to it if the injunction is not issued; (3) the possibility of substantial harm to others if the injunction is issued; (4) and whether the public interest would be served by issuing the injunction. *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions,* 134 F.3d 749, 753 (6th Cir.1998). The elements are factors to be balanced with each other, but each element does not need to be satisfied in order to issue a preliminary injunction. *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1480 (6th Cir.1995). A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries its burden of proving that the circumstances clearly demand it. *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000).

### A. *Likelihood of success on the merits*

Hoover requested injunctive relief based upon its assertion that there was a noncompete provision in the agency contract,

misappropriation of its trade secrets, unfair competition, and breach of contractual obligations and fiduciary duties. If Hoover can show a likelihood of success on the merits of any of the claims, an injunction may issue, subject to consideration of the other factors.

### 1. Non-compete Provision

Paragraph 10 of the agency contract reads as follows:

It is agreed that this is a long term contract. If Carrier [Hoover] ceases to remain in business or can no longer substantially perform as agreed, Agent [Frye] can seek other representation. If Agent can no longer perform as agreed. Carrier can also cancel this contract. However, it is the intent of this contract that it shall remain in effect for as long as either party (Carrier or Agent) remains in the trucking business. This contract cannot be cancelled by either party for the purpose of creating a competitive operation at any time in the Charlotte Metropolitan Area. Agent agrees to represent Carrier exclusively and Carrier agrees that Agent will provide sole representation for the Carrier. If at any time Agent chooses to cease operations. Carrier will be offered the opportunity to assume the operations for the fair market value of all equipment necessary to continue the contract authority operation.

█ The district court construed Paragraph 10 as a non-compete provision. It stated that "Ohio law favors reasonable restrictive covenants." It stated that "in the context of the entire Agency Contract, and paragraph 10 specifically, this clause was likely intended to prohibit Defendant Frye from doing exactly what Plaintiff now finds objectionable – terminating his agency relationship and competing directly with Plaintiff." It found that the non-compete provision was vague and over-broad. It cited Ohio law for the proposition that a

court may, in its discretion, modify the contract in order to make it unobjectionable. It concluded that a one-year limit would not be unreasonable.

Frye argues that there is no post-agency restrictive covenant in the contract. He argues that the above paragraph restricts either party from cancelling the contract for purposes of competition, but does not constrain competition if the contract is cancelled for other reasons. Frye asserts that Hoover cancelled the contract by letter on December 19, 2001. He argued to the district court that even if he had cancelled the contract, that it was because of Hoover's failure to comply with its obligations under the contract. He further argues that even if the language were to be construed as a non-compete provision, it is not enforceable because it is unreasonable because Hoover has not shown its legitimate business interest in preventing him from competing, that it works an undue hardship on him, and that it has no temporal limit.

The Ohio and federal diversity jurisdiction cases that the court cited. *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (1975), *Avery Dennison Corp. v. Kitsonas,* 118 F.Supp.2d 848 (S.D.Ohio), and *Briggs v. Butler,* 140 Ohio St. 499, 45 N.E.2d 757 (1942), are cases in which the court was considering a specific non-compete provision in a contract that contained what the defendant considered to be an unreasonably long time period of restriction. In this case, the provision at issue, by its terms, only proscribes cancelling the contract for a specific reason.

Frye claims that he had been asked to sign a non-compete contract and refused. By signing the contract containing Paragraph 10, it is not clear that he bargained for a non-compete provision. Whatever the provision was "likely intended" to do, it does not accomplish that end. However,

Frye's actions are quite likely a breach of this particular contractual provision. When Frye sent a notice of termination to Hoover on December 18, 2001, he had already created a competitive operation on behalf of Five Star in the Charlotte metropolitan area. A jury might find that he cancelled the contract for the purpose of creating a competitive operation in the area. Such a finding would amount to a breach of contract, however, but not a violation of a non-compete provision. Hence, the district court was not justified in relying on this claim for issuance of the injunction.

### 2. Misappropriation of Trade Secrets

Ohio defines a trade secret as

information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev.Code § 1333.61. In order to succeed on a misappropriation or conversion of trade secrets claim, a plaintiff must show by a preponderance of the evidence (1) the existence of a trade secret: (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret. *GTI Corp. v. Calhoon*, 25 Ohio Misc. 187, 309 F.Supp. 762, 767 (S.D.Ohio 1969). The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence. *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 24 Ohio St.3d 41, 492 N.E.2d 814, 819 (1986).

■ As the district court noted, the Ohio Court of Appeals has determined that contract rates, driver information, and shipper information within the trucking industry are trade secrets, which may be protected through injunctive relief, citing *Vanguard Transp. Sys., Inc. v. Edwards Transfer and Storage Co., Gen. Commodities Div.*, 109 Ohio App.3d 786, 673 N.E.2d 182, 185 (1996). The *Vanguard* court, as well as the district court in this case, cited *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer*, 816 F.Supp. 1242 (N.D.Ohio 1992), in which the court held that a customer list may be a trade secret and that there is a presumption of secrecy regarding such a list when the owner takes measures to keep it from being available to others. Likewise. *Vanguard* holds that contract rates, driver information, and shipper information may be trade secrets, but only to the extent that the information in question is not readily available to the general public and the owner has sought to keep it confidential. *See Vanguard*, 673 N.E.2d at 185.

Hoover contends that Frye used the proprietary and confidential information of Hoover in the course of diverting loads of freight from Hoover to Five Star, including rate information, customer lists, and drivers' files. But the only evidence to support this proposition introduced at the preliminary injunction hearing was Mr. Hoover's testimony that Hoover's rates were used for the 81 loads that were diverted and that Frye had confidential and proprietary information concerning the drivers.

In response, Frye presented testimony to the effect that those in the trucking industry did not consider rate information,

customer information, and driver information trade secrets. Moreover. Frye claims that the customers he served were never Hoover's, but were his and FSI's. He also argues that he set all the rates and recruited all the drivers.

Given the record, the basis for the district court's conclusion that the information at issue constituted trade secrets is unclear. In contrast, evidence in *Vanguard* included precautionary measures taken by Vanguard to protect its information, testimony that the person leaking the information to the competitor company understood that it was confidential, and admissions by an officer of the competitor company that he believed customer files to be protected information. *See Ibid.*

Nevertheless, one bit of testimony regarding rates gives some support to the district court's conclusion that at least Hoover's rates were trade secrets. Vernon Brickey, an agent for Hoover, testified for Hoover that he did not believe rates were a secret in the industry, nor were driver lists. He stated that it would be easy to find out one rate quote, but that it would be difficult to find out 81 separate rate quotes. That, he said, would require "somebody on the inside." On the other hand, the record is devoid of testimony that tended to show that Hoover took precautionary measures to keep this information secret, or to establish an understanding that this information was secret. We therefore conclude, on the basis of the testimony at the preliminary injunction hearing, that the district court abused its discretion in finding that Hoover was likely to prevail on its misappropriation of trade secrets claim.

### 3. Unfair Competition

Ohio law provides that

(A) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another.

Ohio Revised Code § 4165.02.

■ The district court found that Hoover was likely to prevail on its claim of unfair competition, based upon Frye's misrepresentation to drivers and customers that Hoover and Five Star were the same company, that FSI was purchasing Hoover, and that FSI was Hoover's new name. Clontz testified that he deliberately misled a steamship line into believing that Five Star and Hoover were the same company so that he could get containers of freight, originally assigned to Hoover, out of a port by a Five Star driver. Clontz testified that he heard Frye telling others that FSI had purchased Hoover. The district court also cited testimony that indicated that Frye's actions created confusion in the Charlotte area about the relationship between Five Star and Hoover.

The court noted that Frye continues to use the Hoover name in his Five Star business. There are signs on Frye's office door that read "Hoover/FSI Office" and "Hoover's new name FSI." A former Five Star driver, Lloyd Alexander, testified that he encountered problems trying to move containers of freight assigned to Hoover as a Five Star driver. He testified that he would use Hoover's permit, lease, and other Hoover documentation to present to port workers in order to take Hoover loads.

Based on the record, we agree with the district court's conclusion that Hoover would likely prevail on its unfair competition claim.

#### 4. Breach of Fiduciary Duties

An agent is bound to exercise good faith and loyalty toward his principal, and an agent is a fiduciary with respect to matters within the scope of his agency. *Connelly v. Balkwill*, 160 Ohio St. 430, 116 N.E.2d 701, 717 (1954).

The district court found that Hoover was likely to prevail on its breach of fiduciary duty claim because the record indicated that Frye terminated the agency contract and undermined Hoover's business by diverting freight, drivers, and customers to Five Star. Frye argues that breach of fiduciary duty is not a proper basis for injunctive relief. He further argues that he did not keep his relationship with Five Star a secret, nor did he reap secret profits from that relationship. We conclude that it is not necessary to reach the question of whether breach of fiduciary duty is a proper basis for injunctive relief, given our finding that as Hoover is likely to prevail on its unfair competition claim, for which injunctive relief is available.

#### B. *Unclean hands*

█ Frye raises the doctrine of unclean hands as a bar to equitable relief, arguing that Hoover breached the agency contract and conspired with an employee of FSI, Clontz, to misappropriate FSI's trade secrets. Frye contends that Hoover breached the contract in several ways, first, by requiring FSI to open an escrow account, from which FSI was not authorized to withdraw money, that was to be capped at $7,500. He claims that Hoover deposited money owed FSI into the account over and above $7,500. However, Frye does not cite a specific provision in the contract to support his claim of a breach by Hoover.

Second, he claims that Hoover required FSI to purchase insurance for the protection of freight shipped by Hoover, which was not required of any other agent. He claims that FSI was required to compute fuel taxes because Hoover's staff was incompetent. He also claims that Hoover did not follow through with expense disputes regarding containers and tires in accordance with the contract. Again, Frye does not cite provisions in the contract that were allegedly breached, nor does he point to any evidence presented at the hearing that supports these allegations.

Third, Frye claims that Hoover did not pay commissions that were agreed to in Addendum B(1) of the Agency contract, which required the payment of commissions to Frye based on occasional charges. Frye claims that Hoover did not pay FSI these commissions. He states that Mr. Hoover promised he would pay all commissions owed FSI up until October 2001 and that any commissions earned thereafter would be added to the escrow account. But once again, Frye has not pointed to any evidence that tends to establish this claim.

Frye also claims that Hoover has not mitigated its damages to a reasonable extent because it knew that Frye intended to terminate the agency contract long before it happened. He states that Mr. Hoover knew in October that Frye was giving Five Star overflow loads. He claims that Hoover could have prevented much of the harm it now claims to have suffered.

The district court noted that "fraud or unclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence." (quoting *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir.1977)). Frye's allegations of unclean hands are unsupported by much, if any, evidence. We must therefore con-

clude that the district court did not abuse its discretion in rejecting Frye's defense of unclean hands.

### C. *Irreparable harm*

"A loss of customer goodwill often amounts to irreparable injury. . . ." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992). "The existence of an actual threat of irreparable injury may be established by showing that the employee possessed knowledge of the employer's trade secrets." *Levine v. Beckman,* 48 Ohio App.3d 24, 548 N.E.2d 267, 271 (1988). Ohio Revised Code § 4165.02, prohibiting deceptive trade practices, provides for injunctive relief.

 Hoover has provided sufficient evidence to show that it would suffer irreparable harm absent injunctive relief. There was testimony presented at the hearing that Frye's activity caused confusion in the Charlotte market and that this confusion is likely to continue to cause Hoover harm. Damages caused by this confusion and the attendant loss of goodwill would be difficult to calculate, making injunctive relief appropriate. *Basicomputer,* 973 F.2d at 511. The district court did not abuse its discretion in finding that Hoover would suffer irreparable harm absent injunctive relief.

### D. *Substantial harm to others*

Frye argues that an injunction would force FSI to reduce its workforce and would put Five Star out of business. Hoover responds that if Frye is enjoined from engaging as an agent for any motor carrier, the customers that were diverted by Frye can be serviced by Hoover and other local trucking companies. Hoover also argues that Frye will be able to continue to operate his container yard.

The district court concluded that this element of the preliminary injunction inquiry favored neither party, and we agree.

The customers in the Charlotte area will still have shipping alternatives, and Frye will have income from his container operations. It is unclear how Five Star will be harmed by an injunction against Frye. It can simply find another agent if Frye is unable to perform his duties for it. If anything, the district court could have found that this element weighed in favor of injunction as it appears no other party would be substantially harmed by an injunction.

### E. *Public interest*

Frye argues vaguely that an injunction harms "the steamship industry and the trucking industry as a whole." Hoover contends that the district court was correct in finding that the public has an interest in seeing valid contracts honored and is served by discouraging unfair trade practices such as conversion of trade secrets and unfair competition.

 It is difficult to see how the steamship industry and the trucking industry as a whole would be harmed by an injunction. Moreover, the district court is correct that the public has an interest in discouraging unfair trade practices and, thus, did not abuse its discretion by finding that the public interest favored a preliminary injunction in this case.

### III

Because Hoover has established that it is likely to prevail on its unfair competition claim, that absent an injunction it will suffer irreparable harm, and that the public interest is served by an injunction, we conclude that the district court did not abuse its discretion in issuing a preliminary injunction, and therefore AFFIRM the judgment entered below.