[Cite as *Crutcher v. Oncology/Hematology Care, Inc.*, 2022-Ohio-4105.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


JOHN T. CRUTCHER, : APPEAL NOS. C-220086
C-220106
    Plaintiff-Appellant/Cross-Appellee, : TRIAL NO. A-1804358

:

  vs.

: *O P I N I O N.*

ONCOLOGY/HEMATOLOGY    CARE, :
INC.,

OHC REAL ESTATE, LLC, :

   and

RANDY BROUN

    Defendants-Appellees/Cross-
Appellants.


Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded.

Date of Judgment Entry on Appeal: November 18, 2022

*Freking Myers & Reul LLC, Jon B. Allison, Jacobs Kleinman Seibel & McNally LPA,* and *Mark J. Byrne,* for Plaintiff-Appellant/Cross-Appellee,

*Katz, Teller, Brant & Hild, LPA, Robert A. Pitcairn, Jr.,* and *Peter J. O'Shea,* for Defendants-Appellees/Cross-Appellants.

**BERGERON, Presiding Judge.**

{¶1} What began as a promising enterprise for plaintiff-appellant/cross-appellee John T. Crutcher as Chief Executive Officer and Chairman of the Board of Directors of Oncology/Hematology Care, Inc., ("OHC") dissolved into bitterness and his ouster from the corporation. Dismayed by this turn of events, Mr. Crutcher embarked on a decade-long odyssey of litigation against OHC and its affiliates. In the midst of this battle, however, Mr. Crutcher accepted 64 months' worth of payouts from OHC Real Estate, LLC ("OHCRE")—the entity OHC created to hold the real estate that enabled OHC to operate its medical practice—to reimburse him for his equity stake in OHCRE. After more than five years of pocketing these payments, Mr. Crutcher suddenly concluded that he was robbed, and commenced another front in the widening litigation skirmish.

{¶2} In this case, he sued the defendants-appellees/cross-appellants OHC, OHCRE, and Dr. Randy Broun (collectively "the OHCRE defendants"). Although the trial court ruled in his favor regarding his entitlement to an equity payout from OHCRE, Mr. Crutcher now disputes the amount on appeal. But the trial court found him bound, by virtue of waiver by estoppel, to OHCRE's calculations based on his acceptance of those amounts for more than five years. As we explain below, we agree with that conclusion. In fact, we agree with nearly all of the trial court's determinations, and therefore overrule both of OHCRE's cross-assignments of error, and the balance of Mr. Crutcher's assignments of error, save one. We find that the trial court improperly excluded prejudgment interest from its damage computation. Therefore, we remand the cause for that interested to be added but otherwise affirm the trial court's judgment.

# I.

**{¶3}** After OHC formed OHCRE with Mr. Crutcher as a founding member, Mr. Crutcher took the reins as one of two managers of OHCRE in 2004, to "manage and control the business, affairs and properties" of OHCRE in conformity with its Operating Agreement ("Operating Agreement"). During his extensive involvement with OHC and OHCRE, Mr. Crutcher made a series of monetary investments in OHCRE, providing himself with an equity stake in the LLC.

**{¶4}** Upon the termination of a member of OHC, the Operating Agreement calls for the remaining members or the company to purchase the departing member's interest. As spelled out in the document, a member's "Financial Interest" is comprised of various accounts, including an account that accrues 15 percent interest annually. Mr. Crutcher, at the helm of OHCRE and conversant with the Operating Agreement, certainly should have understood how all of this worked.

**{¶5}** OHC terminated Mr. Crutcher in July 2010. Thereafter, OHCRE determined that his Financial Interest totaled $178,535—predicated on the investments he contributed into the LLC. Pursuant to section 6.5(c)(2) of the Operating Agreement, OHCRE elected to pay Mr. Crutcher this amount over ten years with interest beginning in September 2010. A few months after OHCRE began making these payments to Mr. Crutcher—payments that he gladly accepted—he launched his first lawsuit against OHC.

**{¶6}** As part of that lawsuit, Mr. Crutcher submitted an interrogatory requesting the valuation of his membership interest in OHCRE, and he received a schedule illustrating OHCRE's calculation. When Mr. Crutcher filed two motions to

compel discovery in 2010, he never claimed that OHC withheld information related to the calculation of his Financial Interest or the investments he made in OHCRE.

{¶7} After our court dismissed an appeal of the 2010 lawsuit, Mr. Crutcher filed two additional lawsuits against OHC and related parties in 2015. In the first complaint, Mr. Crutcher alleged that OHC owed him approximately $178,535.49, representing his shares in OHCRE. In other words, by this point, Mr. Crutcher had (1) requested and received information concerning the calculation of his Financial Interest, (2) moved to compel discovery on other issues but not anything pertaining to the calculation of his Financial Interest, and (3) confirmed OHCRE's calculation of his stake in OHCRE.

{¶8} With the parties embroiled in litigation, in December 2015, OHC and OHCRE went into forbearance with their senior lender, U.S. Bank. Based on this turn of events, Dr. Broun and OHC demanded that Mr. Crutcher sign a subordination agreement, as requested by U.S. Bank. Section 6.5(c)(2) of the Operating Agreement, a provision concerning a former member's payout of their Financial Interest, provides "as a precondition to receiving any payment from the Company * * * [Mr. Crutcher] shall execute any subordination agreement requested by any lenders or other credit providers to the Company or any of its subsidiaries." After fits and starts of negotiation over the subordination agreement, Mr. Crutcher never signed it, and OHCRE's monthly payments to him ceased. By this point, OHCRE had made 64 monthly payments to Mr. Crutcher, but it still owed him $91,968.57.

{¶9} As the litigation dragged on, the parties started discussing settlement. In December 2016, Mr. Crutcher and OHC entered into a settlement agreement (the "Settlement Agreement"). Although the settlement included a broad release against

4

OHC and its affiliates, the agreement included a carveout, allowing Mr. Crutcher to pursue "any sums that Crutcher is owed, or claims to be owed, from OHC Real Estate, LLC." In other words, this settlement did not resolve the dispute over the Financial Interest payouts that lies at the heart of the present litigation.

{¶10} Meanwhile, business conditions changed for OHCRE, and its board ultimately decided to liquidate its assets, setting in motion a process that would lead to the dissolution of OHCRE. That meant that assets would be sold, and debts (including Mr. Crutcher's) would need to be paid. Happily, OHCRE fetched more for the assets than it had in debt, and thus it began carving up the proceeds. OHCRE eventually determined that Mr. Crutcher's pro-rata share of the liquidation proceeds based off his remaining debt was $149,139. This calculation inured to his benefit because his Financial Interest (i.e., the debt owed to him) at that time totaled only $91,968.57.

{¶11} Nevertheless, that prompted the next salvo in the parties' battle. Mr. Crutcher insisted that the OHCRE defendants were hiding information from him about the relevant calculations, whereas they countered that they had divulged everything that was pertinent. With everyone at an impasse, Mr. Crutcher filed this suit in 2018 against the OHCRE defendants asserting 11 claims, including a breach of contract claim and a failure to pay liquidation proceeds claim. The OHCRE defendants responded with three counterclaims, asserting two separate breach of settlement agreements claims.

{¶12} Although Mr. Crutcher had previously calculated his Financial Interest in litigation as $178,535.49—and accepted five years of monthly payments based off that amount—he declared in the present complaint that he is owed a total "of

5

$3,422,000 to $5,658,000." Later in the litigation, after the trial court asked him to calculate his damages, he pivoted, alleging that "the amount owed Crutcher as of June 1, 2021 with prejudgment interest is $659,639."

{¶13} After both parties filed cross-motions for summary judgment and after the trial court asked the parties to submit calculations for damages, the court issued a series of rulings germane to this appeal: (1) it granted summary judgment for Mr. Crutcher for his breach of contract and liquidation proceeds claims, awarded him $149,573.09, and granted judgment in his favor for the OHCRE defendants' non-disparagement claim; (2) it granted summary judgment in favor of the OHCRE defendants for the remaining claims brought by Mr. Crutcher, and for their breach of settlement counterclaim, awarding them $70,000; and (3) it concluded that Mr. Crutcher was not a member of OHCRE after July 1, 2010. Those rulings triggered an appeal (by Mr. Crutcher) with six assignments of error, and a cross-appeal (by the OHCRE defendants) with two assignments of error.

II.
A.

{¶14} In his first assignment of error, Mr. Crutcher asserts that the trial court erred when it limited his damages to $149,573.09 on his breach of contract and liquidation proceeds claims. The trial court rejected the higher damage amounts that Mr. Crutcher advanced and invoked the waiver by estoppel doctrine to limit Mr. Crutcher's damages due to his acceptance of payments for over five years, his representations to the court in earlier litigation of a Financial Interest that comported with the OHCRE defendants' calculations, and his failure to contest these amounts

6

across years of litigation. For the reasons that follow, we agree with the trial court's conclusion.

**{¶15}** " '[W]aiver by estoppel' exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." (Emphasis omitted.) *Natl. City Bank v. Rini*, 162 Ohio App.3d 662, 2005-Ohio-4041, 834 N.E.2d 836, ¶ 24 (11th Dist.), quoting *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.,* 156 Ohio App.3d 65, 2004-Ohio-411, 804 N.E.2d 979, ¶ 57 (4th Dist.). Whether a party's conduct constituted a waiver generally presents a factual question. *Mark-It Place Foods, Inc.* at ¶ 58 ("If [plaintiff] knew of the breach * * * but represented to [defendant] that no breach had occurred * * * this could constitute a waiver of its rights. Again, this issue is best left for final determination by the trier of fact."). And, of course, we review a grant of summary judgment de novo. *Milatz v. City of Cincinnati*, 1st Dist. Hamilton No. C-180272, 2019-Ohio-3938, ¶ 6.

**{¶16}** The trial court determined that while Mr. Crutcher was in active dispute and litigation with the OHCRE defendants, he accepted 64 monthly payments from OHCRE between 2010 to 2015, totaling $114,778.24 (based on the aggregate $178,000 figure). Now Mr. Crutcher claims that OHCRE duped him by concealing relevant financial documents which should liberate him from his prior actions.

**{¶17}** Yet while allowing the OHCRE defendants to fill his bank account 64 times, he never once protested the value of those deposits. During his deposition, Mr. Crutcher maintained that the payments ran afoul of the mandates of the Operating Agreement. However, in response to questioning about OHCRE's failure to apply a 15 percent compounding interest rate to an account in his Financial Interest, Mr.

7

Crutcher admits he "had other issues that were more important * * * I'm not supposed to say this, I guess, but I consulted with my lawyer about whether it was okay to cash the check * * * this was an issue that would be dealt with later." In other words, he specifically knew that (according to him) OHCRE was paying him the wrong amount of money, but he sounded no alarm.

{¶18} We also must emphasize that Mr. Crutcher was a very sophisticated party—if anyone could detect aberrant calculations, he could. After all, he developed the idea to form OHCRE in the first place, he reviewed the iterations of the Operating Agreement multiple times before its finalization, and he was one of two managers of OHCRE at its inception—Mr. Crutcher was intimately familiar with the operations of OHCRE and knew exactly how to calculate his Financial Interest. Moreover, Mr. Crutcher's Financial Interest is predicated on *his own investments in OHCRE*, investments that he should certainly have knowledge of.

{¶19} And for years prior to this litigation, Mr. Crutcher saw eye to eye with the OHCRE defendants concerning the value of his Financial Interest. He claimed the amount to be $178,535.49 in his complaint in 2010, repeated that again in his complaint in 2015, during a deposition in 2015 declared he was owed "[s]omewhere in the ballpark of $100,000" (which corresponds to the about $90,000 outstanding at the time), and in a summary judgment briefing in 2016, he alleged that his debt was "originally approximately $180,000.00 and is currently approximately $100,000." These aren't accidental slips of the tongue—rather, they represent a consistent position he took in litigation that stands at odds with his present posture.

{¶20} In light of nearly six years of consistent actions and representations by Mr. Crutcher, the OHCRE defendants established clear, unequivocal and decisive

actions by him compelling the grant of summary judgment. *Pollard v. Elber*, 2018-Ohio-4538, 123 N.E.3d 359, ¶ 35 (6th Dist.) ("A party asserting waiver must prove it by establishing a clear, unequivocal, decisive act by the other party, demonstrating the intent to waive."); *Rayl v. East Ohio Gas Co.*, 46 Ohio App.2d 175, 179, 348 N.E.2d 390 (9th Dist.1975) ("[P]laintiffs accept[ed] quarterly payments from defendant for a period of fifteen months after this action was originally filed, * * * [and] they did act in a manner inconsistent with the attempted termination of the agreements. Because plaintiffs accepted the benefits of their agreement during the pendency of this litigation, they are estopped from pursuing this action at this time."); *Quadrant Exploration, Inc v. Greenwood*, 4th Dist. Washington No. 82 X 29, 1983 Ohio App. LEXIS 14550, *7 (Aug. 15, 1983) ("[A]ppellant, by knowingly accepting the delay rental payments for the years 1978, 1979 and 1980, has ratified the 1973 lease to [appellee] and is now estopped to deny the validity of such lease."); *Ultimate Salon & Spa, Inc. v. Legends Constr. Group*, 2019-Ohio-2506, 139 N.E.3d 445, ¶ 38 (11th Dist.) ("Here, it is clear that, due to the length of time that passed while [appellee] accepted the continuing rent without objection, an implied contract arose, and [appellee] accepted a new lease term governed by the provisions of the original lease.").

**{¶21}** Resisting this result, Mr. Crutcher claims that the Operating Agreement's non-waiver provision bars any waiver by estoppel claim, and the lack of "clean hands" should likewise preclude summary judgment. We consider the non-waiver provision: "the failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation."

{¶22} As the OHCRE defendants correctly highlight, this provision only applies to "passive waiver," or a "failure" to act, and not to the affirmative conduct that fills the record in this case. *State ex rel. Morrison v. Wiener*, 2017-Ohio-364, 83 N.E.3d 292, ¶ 30 (9th Dist.) ("[N]onwaiver clauses may not preclude a trial court from finding a waiver of rights where a party acts in an affirmative manner evincing an intent to waive contractual provisions."). Mr. Crutcher's affirmative acceptance of payments for 64 months while simultaneously agreeing with that amount in court does not implicate the non-waiver provision.

{¶23} Mr. Crutcher also accuses the OHCRE defendants of lacking "clean hands" due to their misrepresentations and refusal to provide him with information, featuring that as a barrier to the assertion of an equitable defense. But we fail to see where he raised this point below, and thus we find it waived. *See HSBC Bank USA, N.A. v. Banks*, 8th Dist. Cuyahoga No. 111241, 2022-Ohio-3044, ¶ 22 ("Appellant did not file an answer and assert [the doctrine of unclean hands] at the trial-court level. It is well established that arguments a party fails to raise in the trial-court cannot be considered for the first time on appeal."). Regardless, Mr. Crutcher presents this point in only a paragraph of his appellate brief, devoid of record citations. App.R. 16(A)(7). To establish the clarity of an unclean hands defense sufficient to defeat the waiver by estoppel claim, Mr. Crutcher must do more than that: " '[U]nclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence.' " *State ex rel. Doran v. Preble Cty. Bd. of Commrs*, 2013-Ohio-3579, 995 N.E.2d 239, ¶ 24 (12th Dist.), quoting *Hoover Transp. Servs, Inc. v. Frye*, 77 Fed.Appx. 776, 784 (6th Cir.2003).

{¶24}  And while Mr. Crutcher asserts that waiver by estoppel typically poses a factual question, necessitating a trial, he fails to identify any material dispute of fact that would prevent the issuance of summary judgment on the state of this record.  We accordingly agree with the trial court's decision to apply waiver by estoppel, and we overrule Mr. Crutcher's first assignment of error.

B.

{¶25}  In his second assignment of error, Mr. Crutcher challenges the trial court's decision declaring him no longer a member of OHCRE effective July 2010 and granting summary judgment in favor of the OHCRE defendants for the other nine counts of his complaint.  This assignment covers broad terrain, and necessarily implicates the third and sixth assignments of error, so we address Mr. Crutcher's second, third, and sixth assignments of error together in this section for analytical ease.

1.

{¶26}  We begin with the court's resolution of Mr. Crutcher's membership status.  On this issue, the trial court based its decision on the Operating Agreement's recognition of the concept of a "Departing Member."  Under section 6.5(a), "Upon the termination of a Member's employment with OHC (the 'Departing Member') * * * the Members other than the Departing Member (the 'Remaining Members') or the Company * * * shall purchase from such Departing Member * * * all of the Departing Member's Membership Interest in the Company (the 'Departing Interest')."  Further, section 6.7 prohibits a Departing Member from receiving any distributions under section 9.1, which covers general distributions.  The Operating Agreement also enables

the Departing Member's interest to be paid over time, as OHCRE elected to do with respect to Mr. Crutcher.

**{¶27}** Sifting through these provisions, the trial court concluded that by becoming a "Departing Member," Mr. Crutcher was "no longer a member" because he no longer held an ownership interest—OHCRE had purchased that interest and would pay him over time consistent with the agreement. This maneuver effectively converted him from an equity holder to a creditor of the LLC. But Mr. Crutcher views his status as a "Departing Member" differently, claiming that he should still be entitled to liquidation proceeds under section 13.3(b)(4). The problem with this position is that the trial court seemed to agree with it.

**{¶28}** After all, the court granted him summary judgment on the failure to pay liquidation proceeds claim and denied OHCRE's cross-motion on this point. More importantly, the trial court awarded Mr. Crutcher an amount exceeding his Financial Interest—one that appears consistent with the liquidation proceeds provision under Article 13. Although section 6.7 confirms that Departing Members have no right to distributions under section 9.1, section 13.3(b)(4) (involving liquidation) draws no distinction between Departing Members and Remaining Members. We accordingly find nothing amiss with the trial court's decision regarding liquidation proceeds, nor with its interpretation of the "Departing Member" provisions.

2.

**{¶29}** Mr. Crutcher also takes issue with the trial court's grant of summary judgment on all of his claims against OHC and Dr. Broun based upon section 2 in the Settlement Agreement (referenced above). As he reads the Settlement Agreement, he remained free to pursue claims against Dr. Broun in his capacity as OHCRE manager,

as well as against OHC based on actions that occurred after the Settlement Agreement's execution. Further, Mr. Crutcher argues that the trial court erroneously rejected his claim against OHC under the alter ego doctrine.

{¶30} We begin with the Settlement Agreement. Section 2 of the Settlement Agreement sweeps broadly, releasing OHC and "any * * * employees * * * from any and all claims * * * which [Mr. Crutcher] has or could have against them arising, accruing or originating at any time whatsoever." It is undisputed that Dr. Broun is an employee of OHC, so the trial court correctly determined that this language in section 2 shielded him. And while section 2 contains a broad release, section 4 provides a narrow carveout: "the foregoing releases do not extend to any sums that Crutcher is owed, or claims to be owed, from OHC Real Estate, LLC, an Ohio limited liability company."

{¶31} We must effectuate the structure and purpose of the parties' release. "[T]he overriding consideration in interpreting a release is to ascertain the intent of the parties, which intent is presumed to reside in the language the parties chose to employ in the agreement." *McBroom v. Safford*, 10th Dist. Franklin No. 11AP-885, 2012-Ohio-1919, ¶ 12, citing *Whitt v. Hutchison*, 43 Ohio St.2d 53, 330 N.E.2d 678 (1975). Mr. Crutcher struggles to limit the scope of the release in such a manner as to permit other claims against Dr. Broun. But section 2 constitutes a broad release. "Under Ohio law * * * 'broadly-worded releases are generally construed to include all prior conduct between the parties, even if the scope of such conduct or its damage is unknown to the releasor.' " *State ex rel. Cty. Of Cuyahoga v. Jones Lang LaSalle Great Lakes Corporate Real Estate Partners*, Cuyahoga C.P. No. CV 14 827651, 2016

Ohio Misc. LEXIS 46, *31 (Jan. 26, 2016), quoting *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F.Supp.2d 722, 734-735 (S.D.Ohio 2009).

{¶32} "Further Ohio courts will not read exceptions into a release unless the exclusion of those claims is explicit." *Jones Lang LaSalle* at *31, citing *Task v. Nat'l City Bank*, 8th Dist. App. No. 65617, 1994 Ohio App. LEXIS 5679, *11 (Dec. 7, 2000). If Mr. Crutcher wanted to carve any exceptions out of the broad release, he needed to do so expressly—precisely as he did in section 4. Although he could have sought other exceptions to pursue individuals like Dr. Broun in different capacities, no such provision appears in the agreement, and we will not rewrite the agreement after the fact.

{¶33} Similarly, his effort to insulate post-Settlement Agreement claims is unavailing. Section 2 protects OHC from claims "arising, accruing or originating at any time whatsoever." The crux of the post-agreement claims involves matters that originated pre-agreement, such as Mr. Crutcher's investments in OHCRE, the management of OHCRE's finances and affairs, and his belief that the OHCRE defendants mishandled funds owed to him. Given the broad language of the release, and the connection to pre-Agreement matters, we have no hesitation in deeming these claims subsumed within the ambit of the Settlement Agreement. To the extent that any post-agreement fiduciary claims against Dr. Broun fall beyond the scope of the agreement, however, we find that these claims fail as a matter of law.

{¶34} Such reasoning also spells the demise of Mr. Crutcher's third assignment of error. In that respect, Mr. Crutcher challenges the trial court's grant of summary judgment in favor of OHC and Dr. Broun on their first counterclaim (for breach of the Settlement Agreement) because the Settlement Agreement did not

accomplish a global release of claims. As we have already determined, however, section 2 of the Settlement Agreement contains a broad release that goes well beyond Mr. Crutcher's limited reading, so we see no error in the trial court's conclusion that he violated that provision by suing OHC and Dr. Broun. When a party releases claims, but then brings suit on them, he does so at his own peril.

{¶35} Mr. Crutcher insists that the Settlement Agreement preserves his right to pursue OHCRE for his Financial Interest. We agree with him on that point, but that was not the basis for the trial court's ruling. To the contrary, the court focused on his violation of section 2, rather than the permissible claims allowed by section 4 (that he pursued and prevailed upon). We accordingly overrule Mr. Crutcher's third assignment of error.

3.

{¶36} Mr. Crutcher further pursues an alter ego theory—positing that OHC disregarded OHCRE's separate legal entity and wielded its assets as if they were OHC's to meet its obligations to the detriment of OHCRE's Departing Members. This argument fails for two reasons: Ohio Supreme Court precedent prevents this claim from departing the starting gate, and as discussed above, the Settlement Agreement shields OHC from claims of this ilk.

{¶37} The basics of an alter ego claim are well-settled: "[w]hen a shareholder exercises such control over a corporation that the corporation becomes the shareholder's alter ego * * * it is unjust to allow the shareholder to use the corporate form as a shield to escape the consequences of those wrongful acts." *Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 2009-Ohio-1247, 905 N.E.2d 613, ¶ 11, citing *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 287, 617

15

N.E.2d 1075 (1993). But these claims typically involve one corporate entity (or person) with ownership over the second. Such a situation does not describe OHC and OHCRE as neither has an ownership interest in the other. Confronted with that scenario in *Minno*, the Supreme Court held that one cannot pierce the corporate veil of one corporation despite sharing common shareholders with the other corporation without overlapping ownership: "sister corporations are separate corporations and are unable to exercise control over each other in the manner that a controlling shareholder can." *Id.* at ¶ 13.

{¶38} The situation at hand is no different: Mr. Crutcher alleges that OHC's control over OHCRE through "common ownership and management" allowed OHC to perpetrate its misdeeds against him. But "the common shareholder ownership of sister corporations does not provide one sister corporation with the inherent ability to exercise control over the other. Any wrongful act committed by one sister corporation might have been instigated by the corporation's owners, but it could not have been instigated by the corporation's sister." *Id.* at ¶ 12. Mr. Crutcher cannot circumvent the holding in *Minno* since neither OHC nor OHCRE has an ownership interest in the other, and as a testament to that point, he declines to cite or discuss *Minno* in his briefing before our court. Thus, the alter ego doctrine simply does not apply.

{¶39} Beyond the effect of *Minno*, Mr. Crutcher lacks an answer to the Settlement Agreement and why it would not bar any alter ego claim. The Settlement Agreement releases OHC, and this alter ego claim seems to fall squarely within the scope of the broad release. In summary, we conclude that the trial court did not err in its interpretation and application of the Settlement Agreement.

4.

{¶40} Finally, Mr. Crutcher insists that the OHCRE defendants committed bad faith breach of contract, by ceasing to pay him sums owed to him under the Operating Agreement and trying to force him into a settlement agreement to avoid paying him more money. Along these lines, he also protests that the OHCRE defendants failed to provide him with his financial documents to appropriately calculate his Financial Interest. However, the record does not support these conjectures.

{¶41} OHCRE stopped sending Mr. Crutcher payments based on his refusal to sign a subordination agreement required by U.S. Bank. As the reader will recall, the Operating Agreement specifically obligated him to sign a subordination agreement in these circumstances. And it was not unreasonable, nor in bad faith, for OHCRE to insist on compliance with that provision. After OHCRE elected to liquidate its assets, it then took measures to satisfy Mr. Crutcher's debt obligation.

{¶42} Likewise, OHCRE did not wield a prospective settlement to his detriment, any more so than any party in civil litigation tries to exert pressure to encourage settlement. The OHCRE defendants likely hoped to put an end to a decade's worth of litigation between the parties. "The purpose of a settlement agreement is 'to terminate a claim by preventing or ending litigation and * * * such agreements are valid and enforceable by either party.' " *Brilla v. Mulhearn*, 168 Ohio App.3d 223, 2006-Ohio-3816, 859 N.E.2d 578, ¶ 15, quoting *Brown v. Dillinger*, 9th Dist. Medina No. 05CA0040-M, 2006-Ohio-1307, ¶ 10. "Settlement agreements are highly favored by the law." *Brilla* at ¶ 15. We simply see no evidence of bad faith in the available record.

{¶43} That leaves the question of whether the OHCRE defendants provided Mr. Crutcher with adequate financial information, which overlaps with his sixth assignment of error (related to the denial of his motion to compel discovery), so we will consider these issues together.

{¶44} The fundamental problem with both arguments is that Mr. Crutcher fails to identify what information, exactly, he lacked. Simply contending that he needs more financial information is difficult for us to evaluate, given the volume of financial records that the OHCRE defendants produced in the litigation (including annual balance sheets for OHCRE, documents related to OHCRE's liquidation, spreadsheets showing the distributions of OHCRE assets, and calculations of various Financial Interests, etc.). And, as we alluded to earlier, Mr. Crutcher—based on his intimate familiarity with OHCRE—should be able to pinpoint exactly what documents or categories of information the defendants were hiding. His failure to lend precision to this claim speaks volumes.

{¶45} In its denial of Mr. Crutcher's motion to compel, the trial court held that the OHCRE defendants had appropriately responded to Mr. Crutcher's discovery requests, and "simply because the documents do not reflect what Crutcher believes they should reflect does not mean that [the OHCRE defendants have] not provided the requested documents." We agree. We see nothing in the record to substantiate the improper withholding of financial data to which Mr. Crutcher should have been entitled. This establishes that the trial court did not abuse its discretion in denying the motion to compel (sixth assignment of error), nor did it err in the pertinent summary judgment rulings (second assignment of error) related to this point.

18

{**¶46**} For all of the aforementioned reasons, we overrule Mr. Crutcher's second, third, and sixth assignments of error.

C.

{**¶47**} In Mr. Crutcher's fourth assignment of error, he protests the trial court's failure to award pre and postjudgment interest as to his breach of contract claims, pointing to R.C. 1343.03. Although the OHCRE defendants insist that he waived this claim, when asked to calculate his damages before the trial court, Mr. Crutcher provided a calculation that included prejudgment interest. We find this measure sufficient for preservation's sake.

{**¶48**} First, we consider the postjudgment claim, governed by R.C. 1343.03(B): "interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct * * * shall be computed from the date the judgment, decree or ordered is rendered." Postjudgment interest is simply operative by statute, and nothing in the record indicates that the trial court denied Mr. Crutcher postjudgment interest. *See Non-Employees of Chateau Estate Resident Assn. v. Chateau Estates, Ltd.*, 2d Dist. Clark Nos. 2005-CA-75, 2005-CA-90, 2005-CA-91, 2005-CA-101, and 2005-CA-116, 2007-Ohio-319, ¶ 72 ("[B]ecause nothing in the record indicates that the trial court has denied post-judgment interest or that it will do so in the future, we overrule the * * * assignment of error."). Moreover, because postjudgment interest is necessarily added on top of the judgment amount, the trial court could not include a calculation for this in the judgment (because it does not know when the defendant will pay). Therefore, we see no error in the trial court's failure to include postjudgment interest in the damage award.

{¶49}  With respect to prejudgment interest, Ohio law requires imposition of prejudgment interest on contract claims.  R.C. 1343.03(A) ("[W]hen money becomes due and payable upon * * * all judgment, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code * * *."); *see Cantwell Mach. Co. v. Chicago Mach. Co.*, 184 Ohio App.3d 287, 2009-Ohio-4548, 920 N.E.2d 994, ¶ 30 (10th Dist.) ("1343.03(A) requires an award of prejudgment interest on contract claims.  Once a plaintiff receives judgment on a contract claim and requests prejudgment interest, the trial court must award prejudgment interest under R.C.1343.03(A).").

{¶50}  Although a party can certainly waive prejudgment interest by failing to request it (as the OHCRE defendants claim occurred here), in the relevant damage calculation, Mr. Crutcher specifically sought prejudgment interest, calculated based on the statutory interest rate.  The trial court never specifically rejected this claim, and it might simply have been an oversight.  Regardless, we cannot calculate the appropriate amount of prejudgment interest because the trial court will need to determine the appropriate starting date for interest to run.  We accordingly sustain the fourth assignment of error in part, insofar as the court declined to award prejudgment interest, and we remand for the limited purpose of determining the date on which prejudgment interest began to run and the appropriate amount of interest, consistent with the statute.

D.

20

{¶51} In Mr. Crutcher's fifth assignment of error, he claims the trial court erred by excluding his expert's testimony for failure to provide an expert report. Specifically, he asserts that the relevant scheduling order instructed that "Plaintiff's experts and all affirmative experts to be identified and reports, if any" be submitted by December 13, 2019. Therefore, because the order did not require reports, so his reasoning goes, he should not be faulted for failing to provide one. The only problem is that Mr. Crutcher misquotes the scheduling order in question, which tellingly did not include the "if any" caveat. The order thus required the production of expert reports, and Mr. Crutcher fails to offer any explanation for his erroneous quotation.

{¶52} The scheduling order's directive also comports with the relevant local rules, which require that a party submit the "opinions" of experts prior to trial. *See* Loc.R. 15(A) of the Court of Common Pleas of Hamilton County ("At the conclusion of the case management conference, a case management order shall be prepared and entered. The order shall include * * * the identification of any expert witness and their opinions."); Loc.R. 15(B)(2)(f) of the Court of Common Pleas of Hamilton County (If a judge elects to have a pretrial conference before trial, "all trial attorneys shall file with the judge * * * copies of available opinions of all persons who may be called as expert witnesses."). About ten days after Mr. Crutcher failed to comply with this deadline, the OHCRE defendants moved to exclude his expert witnesses and expert testimony. Pursuant to Civ.R. 37(B)(1), a court may "issue further just orders" when a party "fails to obey an order to provide or permit discovery."

{¶53} In late March 2020 (i.e., three months after the deadline),[1] the trial court considered the matter, but did not immediately strike the expert testimony. Instead, it provided Mr. Crutcher five additional business days to produce an expert report, bending over backwards to give him another chance. Five days came and went without any expert report, but the court did not actually strike the expert testimony until the end of June 2020. Against this backdrop, Mr. Crutcher fails to explain why he could not have complied—at some point—with the requirement in the scheduling order and the local rules to submit an expert report. Nor can we evaluate any prejudicial impact by the exclusion of this expert testimony since we see no proffer or similar evidence in the record that would have elaborated on the nature of this expert testimony. Regardless, we see no abuse of discretion based upon the record at hand.

III.

{¶54} Turning to the OHCRE defendants' cross-appeal, they assert the trial court erred in granting summary judgment for Mr. Crutcher for his breach of contract and liquidation proceeds claims, and in finding that he had not breached the Settlement Agreement's non-disparagement provision.

A.

{¶55} In the OHCRE defendants' first assignment of error, they maintain that the trial court erred by granting judgment in favor of Mr. Crutcher for his breach of contract and liquidation proceeds claims. They base their claim on his failure to execute the subordination agreement requested by U.S. Bank as required under

---

[1] Needless to say, this deadline fell at the outset of the Covid-19 pandemic, but the Supreme Court's tolling order provides that specific court orders supersede the tolling provisions. *In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court & Use of Tech.*, 158 Ohio St.3d 1447, 1448, 2020-Ohio-1166, 141 N.E.3d 974. Also, we see no argument advanced by Mr. Crutcher that he simply needed some reasonable additional time to procure the report.

22

section 6.5(c)(2) of the Operating Agreement, essentially arguing that his breach of that provision of the Operating Agreement excused further performance by them. We review this question of law de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

{¶56} To restate the sequence of events, in September of 2010, OHCRE began making monthly payments to Mr. Crutcher as part of his Financial Interest owed as a Departing Member. But those payments came to a halt in December 2015 when OHC and OHCRE went into forbearance with U.S. Bank, and Mr. Crutcher elected to not sign a subordination agreement. The Operating Agreement, in pertinent part, provides, "as a precondition to receiving any payment from the Company * * * [Mr. Crutcher] shall execute any subordination agreement requested by any lenders or other credit providers to the Company or any of its subsidiaries."

{¶57} But the OHCRE defendants' argument falters for two reasons. First, the OHCRE defendants demonstrate no evidence that Mr. Crutcher's failure to sign a subordination agreement prejudiced them in any way. In other words, at least as far as the record discloses, U.S. Bank took no adverse action against the OHCRE defendants based on the missing subordination agreement. "[N]ot all breaches are created equal. A failure to perform a promise that is nominal, trifling, technical, or slight does not excuse performance under the contract by the nonbreaching party." *H&H Glass, Inc. v. Empire Bldg. Co., LLC*, 1st Dist. Hamilton Nos. C-150059 and C-150227, 2016-Ohio-3029, ¶ 7. " '[A] breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement.' " *Id.*, quoting *Software*

23

*Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App.3d 163, 170, 583 N.E.2d 1056 (1st Dist.1990).

**{¶58}** We, of course, understand the purpose of the subordination agreement requirement and could certainly envision circumstances when its breach would constitute a material breach that would excuse further performance. But on this record, the OHCRE defendants have failed to generate a material dispute of fact on this point, and the trial court correctly rejected their argument.

**{¶59}** Second, even if the breach could be considered material, OHCRE was still required to pay Mr. Crutcher his share of the liquidation proceeds pursuant to section 13.3(b)(4) of the Operating Agreement, and that provision did not impose any subordination agreement mandate. As we determined above, Mr. Crutcher was rightfully awarded liquidation proceeds pursuant the trial court's decision. Because the trial court correctly awarded Mr. Crutcher his share of liquidation proceeds, it essentially moots the subordination agreement debate. We accordingly overrule the OHCRE defendants' first cross-assignment of error.

B.

**{¶60}** In the OHCRE defendants' second cross-assignment of error, they maintain that the trial court should not have granted summary judgment on their breach of non-disparagement provision claim. Section 7 of the Settlement Agreement prohibits Mr. Crutcher from communicating in any way "that might be reasonably construed to be derogatory or critical of, or negative toward," OHC or any of its employees or representatives.

**{¶61}** The OHCRE defendants identify a handful of statements that allegedly run afoul of this provision, but most of these are statements directly made in litigation.

24

They seize upon various comments from the 2018 complaint, accusing OHC and Dr. Broun of "seek[ing] to mislead this court" through a series of "misrepresentations, omissions and false assertions" as well as subsequent pleadings accusing the OHCRE defendants "and/or their counsel" of "engaging in gamesmanship, mischaracterizations, selective and out of context quotations, misleading or false assertions, and unfounded arguments to try to define a false narrative."

**{¶62}** The trial court found that statements in this vein fell within the ambit of the litigation privilege, which "provides absolute immunity from civil suits for defamatory statements made during and relevant to judicial proceedings * * * * [it] is designed to protect 'the integrity of the judicial process' by affording participants in litigation with immunity from future lawsuits over relevant statements made during judicial proceedings." (Emphasis deleted.) *Reister v. Gardner*, 164 Ohio St.3d 546, 2020-Ohio-5484, 174 N.E.3d 713, ¶ 10,14, quoting *Willitzer v. McCloud*, 6 Ohio St.3d 447, 449, 453 N.E.2d 693 (1983). We agree with the trial court's assessment here—these challenged statements were all made in pleadings within the litigation, and we see no reason why the privilege should not apply.

**{¶63}** In an email to OHC's counsel and Dr. Broun, Mr. Crutcher accused the two of making "an affirmative misrepresentation" and "mere posturing" and speculated about what they were "trying to hide." The trial court aptly concluded that "no reasonable minds can find the alleged conduct by [Crutcher] * * * to violate the non-disparagement clause in the settlement agreement." Again, we agree, for two reasons. First, the provision in the Settlement Agreement was designed to protect each party from statements made to third parties, not statements made to each other. Second, an email to counsel about matters occurring in litigation strikes us as "relevant

25

to judicial proceedings." *Reister* at ¶ 10. Both reasons support the trial court's determination, and we accordingly overrule the OHCRE defendants' second cross-assignment of error.

\*　　\*　　\*

{¶64} In light of the foregoing analysis, we overrule the two cross-assignments of error raised by the OHCRE defendants. We sustain Mr. Crutcher's fourth assignment of error concerning prejudgment interest, but overrule his remaining assignments of error. Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded to the trial court to determine the amount of prejudgment interest to be awarded to Mr. Crutcher and to enter judgment for that amount, and for further proceedings consistent with this opinion.

Judgment affirmed in part and reversed in part and cause remanded.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.